IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ATRICE PRYOR,                    )
                                 )
              Plaintiff,         )
                                 )
     v.                          )    No.  05 C 1960
                                 )
JOANNE B. BARNHART,              )
                                 )
              Defendant.         )

## MEMORANDUM OPINION AND ORDER

Atrice Pryor ("Pryor") seeks judicial review of a final

decision of Commissioner of Social Security Jo Anne Barnhart

("Commissioner") that denied Pryor's application for disability

insurance benefits under Title II of the Social Security Act

("Act"), 42 U.S.C. §§416(i), 423.[1]  Both sides have moved for

summary judgment under Fed. R. Civ. P. ("Rule") 56, with Pryor

having moved alternatively to remand for further proceedings.[2]

---

[1]   All further statutory references will take the form
"Section--," using the Title 42 numbering rather than the Act's
internal numbering.  All 20 C.F.R. provisions will be cited "Reg.
§--."  Finally, Pryor's memorandum will be cited "P. Mem.--."

[2]   Although the reply memorandum from Pryor's counsel was
due to be filed on February 17, that date came and went without
this Court having received it--or even a motion seeking an
extension.  When this Court's minute clerk then left a voicemail
inquiry for Pryor's counsel (who has regrettably not been
reliable in adhering to schedules in the past), his return call
gave the "explanation" that because of some in-office difficulty,
he had not yet even retrieved the memorandum that government
counsel had filed and served back on January 27, let alone having
begun to prepare his reply.  Because the analysis here shows that
a remand is called for, and on the record Pryor could not prevail
via summary judgment whatever her counsel might assert by way of
reply, this opinion is being issued without awaiting that
delinquent filing for an indeterminate period.

For the reasons stated in this memorandum opinion and order, both parties' Rule 56 motions are denied but Pryor's alternative motion to remand is granted.

## Procedural Background[3]

Pryor filed an application for benefits on May 18, 2000, originally asserting a disability onset date of July 23, 1998 (R. 100).[4] On August 9, 2000 her application was initially denied, and on October 4, 2000 it was again denied upon reconsideration (id. 86, 93). After she then filed a timely request for hearing, on August 1, 2001 Pryor--now represented by counsel--appeared before ALJ Richard Boyle for that purpose (at the "Hearing")(id. 41-74). Only Pryor testified at the Hearing. ALJ Boyle's September 24, 2001 decision concluded that Pryor was not disabled (id. 28).

Next Pryor filed a request for review by the Appeals Council on November 26, 2001 (R. 11-14). After examining the ALJ's decision, the Appeals Council denied Pryor's request on January 30, 2002 (id. 9-10). Pryor then retained new counsel, who repeatedly asked the Appeals Council in 2002 and 2003 for an extension of time to file a district court action but received no

---

[3] What follows as to both procedure and factual substance is drawn from the administrative record (cited "R.--").

[4] In both a prehearing memorandum and at the hearing before the Administrative Law Judge ("ALJ"), Pryor's counsel moved to amend the onset date to February 17, 1999 (id. 43, 157). That motion was granted.

2

response to those requests (id. 6-8). It was then not until
April 4, 2005 that Pryor filed her Complaint for judicial review.
More than two months later (on June 23, 2005) the Appeals Council
granted Pryor an extension through April 4 to file a civil
action, making her already-filed Complaint timely (id. 5).[5]

## Factual Background

Pryor was born on February 17, 1949 and was thus 52 years
old at the time of the Hearing (R. 100). She is 5 feet 5 inches
tall and weighs about 200 pounds (id. 233, 236, 240).[6] As for
her education, Pryor completed 12 years (through high school),
then attended two years of college (id. 119). She has extensive
work experience, including as a customer service representative,
telephone operator, supply attendant, lunchroom attendant and
teacher's and home aid (id. 45-49).

Pryor's complaints of numerous ailments include back pain,
neck pain, leg pain, wrist pain, headaches, arthritis, diabetes

[5] On May 25, 2005 this Court granted Commissioner's
unopposed motion to remand Pryor's case because Pryor's file
could not be located. Once the file was found, this Court
reinstated Pryor's case on August 10, 2005 pursuant to
Commissioner's unopposed motion.

[6] In her original benefits application Pryor said that she
was 5 feet 9 inches tall and weighed 170 pounds (R. 112). That
makes no sense. After seeing Pryor on December 17, 1999 (five
months before the application), Dr. Audrey Geannopoulos, one of
Pryor's treating physicians, described Pryor as 65 inches and 204
pounds (id. 233, 236). And Dr. Geannopoulos reported that on
June 21, 2000 (just a month after the application) Pryor was 65
inches and 200 pounds (id. 240).

3

and high blood pressure (R. 113). Her first efforts to obtain treatment as reflected in the record go back to 1996, when she sought chiropractic care to alleviate her back pain (id. 174). She underwent such chiropractic adjustments from October 1996 until April 1999 (id. 183-92).

Although her chiropractic adjustments appear to have helped ameliorate some of her symptoms, Pryor continued to have pain in her lower back, arm and shoulder (R. 202). On February 17, 1997 she underwent an MRI scan of the spine that revealed degenerative disc disease at L5-S1 and a bulging disc at L4-L5 with no herniation (id. 159). One month later Dr. Gary Skaletsky diagnosed Pryor with right lumbar radiculopathy[7] and low back pain and advised her to get steroid injections if her symptoms worsened (id. 201). Pryor followed Dr. Skaletsky's advice, and after her third lumbar epidural injection her symptomatology was "markedly improved" (id. 198). One year later, however, her lower back pain returned--this time accompanied by pain in her left arm and numbness over the fourth and fifth fingers of her left hand (id. 197). At that point an MRI of the cervical spine revealed a large herniated disc at C5-6, and Dr. Skaletsky recommended physical therapy (id. 194).

In April 1999 Pryor began having recurrent pain in her left

---

[7] Radiculopathy is a disorder of the spinal nerve roots (Stedman's Medical Dictionary 1503 (27th ed. 2000)).

4

neck and shoulder. She consulted Dr. Donald Roland for assistance (R. 212). Dr. Roland diagnosed Pryor as having cervical radiculopathy secondary to a herniated disc at the C5-6 level (id. 213). Dr. Roland noted that despite Pryor's pain she had full range of motion in her neck and a normal gait (id.).

Following Dr. Roland's instruction, Pryor then underwent six weeks of physical therapy and two cervical epidural steroid injections, none of which afforded her relief (R. 207-10). When Dr. Roland next examined Pryor on June 26, 1999, he noted that Pryor continued to have pain in her neck with extension into the left upper extremity and noticeable weakness (id. 207). He also reported that Pryor had decreased sensation in the C6 dermatomal distribution, absent deep tendon reflexes on the left side for the biceps, triceps and brachioradialis and "slightly decreased [motor strength] on the left side but definitely improved from her initial evaluation" (id.). To ameliorate those symptoms, on August 6, 1999 Pryor underwent an anterior C5-6 microdiscectomy and interbody fusion (id. 228).

Pryor's medical record reflects only one additional treatment note after that surgery. On August 18, 2000 Dr. Chenelle evaluated Pryor (R. 259) and reported that although Pryor's neck and hand pain had subsided following her cervical discectomy and fusion, those symptoms recurred one year later. Added to them were some sensory and reflex loss. Dr. Chenelle

noted, however, that Pryor's "[m]otor is 5/5 throughout" and that she had neither muscle spasms nor loss of motion in her cervical spine (id.).

In addition to her treatment notes, Pryor submitted for ALJ Boyle's consideration a series of Bureau of Disability Determination Services' questionnaires filled out by Dr. Geannopoulos. On June 14, 2000, six months after her then most recent examination, Dr. Geannopoulos completed Diabetic, Arthritic and Cardiac Reports for Pryor (R. 233-39). In the Diabetic Report Dr. Geannopoulos noted that Pryor was compliant with her prescribed treatment and was having neither vascular complications nor neuropathy (id. 233). Dr. Geannopoulos' Arthritic Report stated that Pryor had cervical disc disease and that as a result she suffered from ongoing neck pain, radicular pain in the left arm and hand and some loss of motion in her neck (id. 234-35). Dr. Geannopoulos further reported that Pryor's ambulation and grip strength were normal and that she had no manipulative or fine limitations in either hand (id.). She explained that Pryor's only work-related limitation was that Pryor should do limited lifting and carrying (id. 235). Finally, in her Cardiac Report Dr. Geannopoulos diagnosed Pryor as suffering from hypertension and diabetes (id. 236). Dr. Geannopoulos reported that Pryor had no symptoms occurring during ordinary physical activity and that her ability to perform

6

activities of daily living were limited only by her inability to lift and perform repetitive movements (id. 237-38).

Dr. Geannopoulos again filled out Diabetic, Arthritic and Cardiac Reports for Pryor on July 27, 2000 after having examined her on June 21 (R. 240-46). In large measure those Reports simply echoed Dr. Geannopoulos' earlier Reports. There were, however, some slight changes of note. Dr. Geannopoulos' July Diabetic Report found that Pryor had questionable arm neuropathy (id. 240). That second Arthritic Report did not identify any loss of joint motion in the neck, limiting Pryor's work constraints simply to no heavy lifting (id. 242). Finally, the new Cardiac Report stated that Pryor had fatigue, palpitation and dyspnea from ordinary physical activity but that she had "normal" ability to perform activities of daily living (id. 244-45).

While she did not conduct any followup examination, on September 14, 2000 Dr. Geannopoulos provided a revised Arthritic Report and a Spinal Disorders Report (R. 255-58). That third Arthritic Report stated that Pryor had loss of joint motion in the cervical spine, lower back and neck pain and included in her work restrictions no heavy lifting, prolonged standing or carrying (id. 256). Dr. Geannopoulos' Spinal Disorders Report listed as her "Diagnoses" for Pryor lumbar disc surgery and cervical discectomy (id. 257). Dr. Geannopoulos documented Pryor's complaints of pain in her neck, left shoulder and lower

7

back, her paresthesia in her left arm and her slight loss of
motion in her cervical spine (id. 257-58). In addition Dr.
Geannopoulos noted that Pryor could ambulate normally, was weight
bearing and was limited in her work-related activities only by
her inability to perform heavy lifting and carrying (id. 258).

Along with those Reports the record contains state agency
reviews of Pryor's medical impairments. Drs. Bruce Donnelly and
Vargilio Pilapil, both non-examining state agency physicians,
evaluated Pryor's medical records and opined that she was not
disabled (R. 84-85). Dr. Donnelly also performed a residual
functional capacity ("RFC") assessment (id. 247-54), finding that
Pryor was subject to a number of exertional limitations,
including only occasionally lifting up to 20 pounds, frequently
lifting and carrying up to only 10 pounds and standing and/or
walking and sitting a maximum of six hours in an eight-hour
workday. Dr. Donnelly also thought that Pryor should never climb
ladders, ropes or scaffolding (id. 249).

At the Hearing ALJ Boyle took testimony from Pryor, asking
her about the pain in her neck, back and wrist and about her
diabetes. On a scale of 1 to 10 (with 10 being the most severe),
Pryor described her neck pain as a 7 (R. 50). But she said that
because her doctor had doubled her daily dosage of Neurontin from
two to four pills, her pain had decreased and was currently at
about a 5 (id. 50-51). Pryor also said that she "tr[ied] to keep

8

[her] activities down" and follow her therapy to minimize the pain, and that turning her neck, extremes of heat and cold and noise exacerbated her pain (id. 51-52). She explained that while her surgery in 1999 helped ameliorate some of her neck pain, it did not provide her with complete relief (id. 53).

As to her back Pryor explained to the ALJ that she was currently in a significant amount of pain and that she was scheduled to visit her neurologist the next Monday, August 6 (R. 54). She rated her current pain at a 9, although she said it was usually between a 4 and a 5 (id. 55). Walking, doing housework and any other exertion exacerbated her pain (id. 56). Although no doctor required her to, she said that she used a cane when the pain in her back was severe (id. 57).

Pryor additionally explained that she had diabetes but that her only problem stemming from that disease was the swelling of her feet and ankles (R. 58). She said that medication helped alleviate that problem when it arose. And finally Pryor stated that she has had a number of surgeries on her wrist and that it was painful at times (id. 59-60).

In addition to inquiring as to her ailments, ALJ Boyle questioned Pryor about her daily living activities. Pryor explained that her ailments made it difficult for her to perform certain activities, such as opening jars, sitting or standing in one place for long periods of time (she said her neck and back

9

would start to bother her after about 30 minutes), bending or
stooping and reaching overhead (R. 60, 63-64). But Pryor said
she was able to walk 45 minutes per day (as prescribed therapy
for her neck), to do some limited household chores (dusting and
grocery shopping) and to go to church and practice with the
church choir (id. 63, 65-67).

## ALJ Determination

ALJ Boyle reviewed the submitted evidence and made a series
of findings (R. 26-27):

1. Pryor "met the disability insured status
requirements of the Act on February 17, 1999, the date
the claimant stated she became unable to work, and
continues to meet them through the date of this
decision."

2. Pryor has "not engaged in substantial gainful
activity since February 17, 1999."

3. Pryor has a "history of herniated disks of the
cervical and lumbar spines, and non-insulin dependent
diabetes mellitus, but she does not have an impairment
or combination of impairments listed in, or medically
equal to one listed in Appendix 1, Subpart P,
Regulations No. 4."

4. Pryor "has the residual functional capacity to
perform the physical exertion and non-exertional
requirements of light work except for lifting over 20
pounds at a time with frequent lifting and carrying of
up to 10 pounds, and walking and standing as much as
six hours out of an 8 hour work day." Her RFC for the
full range of light work, however, is "reduced by
inability to climb ladders, ramps or scaffolds."

As a result of those findings the ALJ held that Pryor was not

disabled and therefore not entitled to benefits (id. 28).

10

## Standard of Review

Judicial review of any decision by Commissioner, as authorized by Section 405(g), requires that findings of fact must be upheld if they are supported by substantial evidence. Review is therefore limited to determining (1) whether Commissioner applied the correct legal standards in reaching the decision and (2) whether there is substantial evidence in the record to support the findings (Rice v. Barnhart, 384 F.3d 363, 368-69 (7th Cir. 2004)). Substantial evidence means "no more than such 'relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" (Kepple v. Massanari, 268 F.3d 513, 516 (7th Cir. 2001), quoting--as always in these cases--Richardson v. Perales, 402 U.S. 389, 401 (1971)). In that respect this Court must look at the entire administrative record, but it may not "reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner" (Clifford v. Apfel, 227 F.3d 863, 869 (7th Cir. 2000)). That does not however call for an uncritical rubber-stamping of Commissioner's decision (id.).

To be eligible for benefits Pryor must suffer from a "disability," defined in pertinent part as (Section 423(d)(1)(A)):

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last

11

for a continuous period of not less than 12 months.
Knight v. Chater, 55 F.3d 309, 313 (7th Cir. 1995)(citations
omitted) describes the familiar five-step inquiry prescribed by
Reg. §416.920 to determine whether a claimant is disabled:

> 1. whether the claimant is currently
> employed;
> 2. whether the claimant has a severe
> impairment;
> 3. whether the claimant's impairment meets
> or equals one of the impairments listed by the
> SSA, see 20 C.F.R. §404 Subpt. P, App. 1;
> 4. whether the claimant can perform her past
> work; and
> 5. whether the claimant is capable of
> performing work in the national economy.

If a claimant satisfies steps one, two, and three, she
will automatically be found disabled. If a claimant
satisfies steps one and two, but not three, then she
must satisfy step four. Once step four is satisfied,
the burden shifts to the SSA to establish that the
claimant is capable of performing work in the national
economy.

## Failure To Articulate at Step Three

Pryor first challenges the ALJ's determination at step

three, arguing that ALJ Boyle failed to articulate the reasons

for his decision and to undertake an analysis of whether Pryor's

conditions equaled a listing (P. Mem. 13-15). Our Court of

Appeals has long held that for any judicial review to be

meaningful, an ALJ has a duty to articulate, at least minimally,

the bases for his or her decision--a duty that exists at step

three as elsewhere (see, e.g., Brindisi v. Barnhart, 315 F.3d

783, 785-87 (7th Cir. 2003); Stein v. Sullivan, 892 F.2d 43, 47

(7th Cir. 1990)). Steward v. Bowen, 858 F.2d 1295, 1299 (7th Cir. 1988) carved out a narrow exception to that rule: Where there is no evidence supporting a contrary determination, the ALJ need not articulate his rationale for simply accepting the medical opinions in the record (see also Scheck v. Barnhart, 357 F.3d 697, 700-01 (7th Cir. 2004)).

In that respect ALJ Boyle stated (R. 23):

Disability is alleged secondary to herniated disk of the cervical spine, headaches, arthritis, diabetes mellitus and pain. Those impairments are severe, but do not singly or in combination meet or equal any section of the Listing of Impairments (Appendix 1 to Subpart P of 20 CFR Part 404). Accordingly, her residual functional capacity must be assessed to see what, if any, work she can perform.

Although the second sentence is both brief and conclusory, that is easily explained (and justified) by the unique circumstances of this case. In his prehearing memorandum on Pryor's behalf, her then attorney expressly conceded that she did not meet or equal any listing (R. 156).[8] ALJ Boyle thus cannot be faulted for failing to engage in a needless exercise of citing and analyzing Pryor's ailments under particular listings to address

---

[8] Consistently with that concession, at both the Hearing and in the memorandum to the Appeals Council requesting review of the ALJ's decision (R. 14, 43) Pryor's attorney focused on showing that Pryor could do only sedentary work, which at her age and with her skills would classify her as disabled (see Reg. Pt. 404, App. 2, Table No. 1).

13

an issue not in dispute.[9]

Even if no concession had been made, ALJ Boyle's statement would not be subject to attack for a claimed failure to articulate. After all, Pryor bears the burden of proof on the step three subject (Maggard v. Apfel, 167 F.3d 376, 380 (7th Cir. 1999), and she has unsurprisingly failed to point to any evidence to demonstrate that her impairments meet or equal a listing. Indeed, as the ensuing discussion shows, there is no such evidence in the record.

To meet a listing a claimant must satisfy all of the criteria in that listing (Rice, 384 F.3d at 369). Both parties' memoranda mistakenly discuss the current version of Listing 1.04, which did not take effect until February 19, 2002--after the Appeals Council had declined to review Pryor's case, so that the ALJ's decision had become final (66 Fed. Reg. 58010, 58010, 58017-18 (Nov. 19, 2001)). Hence the proper listing under which to evaluate Pryor's spinal disorders was the previously existing musculoskeletal Listing 1.05C (id. at 58011; Rice, 384 F.3d at 369 n.4). And to meet Listing 1.05C a claimant must have (Reg. Pt. 404, Subpt. P, App. 1, §1.05C (2001)):

   vertebrogenic disorders...with the following persisting
   for at least 3 months despite prescribed therapy and

---

⁹ True enough, the ALJ could have added a reference to Pryor's counsel having conceded that she neither met nor equaled a listing, but any such reference was not a necessary adjunct to his stated conclusion.

expected to last 12 months. With both 1 and 2:

> 1. Pain, muscle spasm, and significant limitation of motion in the spine; and

> 2. Appropriate radicular distribution of significant motor loss with muscle weakness and sensory and reflex loss.

While plenty of evidence documented Pryor's pain, muscle weakness and sensory and reflex loss (see, e.g., R. 197, 207, 212, 233, 257-59), there was nothing that showed she had a significant limitation of motion in her spine or a significant motor loss. Only Dr. Geannopoulos found that Pryor had any loss of motion in her cervical spine, and on at least one occasion she characterized that loss as slight (id. 235, 256, 258). And Drs. Roland and Chenelle both affirmatively found that Pryor had the full range of motion in her spine (id. 213, 259). In addition, only Dr. Roland found that Pryor had "slightly decreased" motor strength, while Drs. Chenelle and Geannopoulos repeatedly found Pryor to have normal ambulation and gait (id. 207, 235, 258, 259). Those findings can hardly be considered to represent the type of significant limitation and loss that Listing 1.05C requires.[10] Moreover, there was no record evidence of muscle

---

[10]     As a result, Pryor's claim that she meets Listing 11.14 is also empty. Listing 11.14 incorporates Listing 11.04B to require a claimant to have peripheral neuropathies with:

> Significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station, in spite of required treatment.

15

spasms.

Similarly, Pryor points to no evidence to suggest that she equaled any listed impairment. Her P. Mem. 14-16 simply asserts, without more, that the ALJ committed an error of law. That as such is insufficient to shoulder her burden of proof--and more important, it is not supported by the record. Two state agency physicians filled out Disability Determination and Transmittal forms stating that Pryor was not disabled through September 27, 2000 (R. 84-85). ALJ Boyle was entitled to rely on those opinions.[11] As reiterated in Scheck, 357 F.3d at 700, quoting Farrell v. Sullivan, 878 F.2d 985, 990 (7th Cir. 1989):

> These forms conclusively establish that "consideration by a physician...designated by the Commissioner has been given to the question of medical equivalence at the initial and reconsideration levels of administrative review."

## Credibility Determination

What has been said up to now validates ALJ Boyle's step three determination without any reliance on his adverse

---

Here the total absence of evidence demonstrating significant loss of motor function (as well as the presence of evidence confirming Pryor's showing a normal gait and ambulation) dooms Pryor's argument.

[11] Even though ALJ Boyle did not expressly discuss those state agency reports in his discussion at step three, he did so in his RFC determination. "Because it is proper to read the ALJ's decision as a whole," Rice, 384 F.3d at 370 n.5 calls on this Court to "consider the ALJ's treatment of the record evidence in support of both his conclusions at steps three and five."

16

credibility determination as to Pryor--that is, she has failed to carry her burden to identify any listed impairment that she meets or equals, even if her own testimony regarding her subjective pain were to be credited. And because no effective challenge has been mounted to the ALJ's thoughtful step five determination, it might well be viewed as appropriate to end the analysis here and grant Commissioner's Rule 56 motion.

But because, as will be seen, the ALJ's lack-of-credibility determination was flawed, and because a harmless-error approach by this Court that would discount that flaw entirely could be considered problematic,[12] this opinion goes on to examine that determination. As Briscoe v. Barnhart, 425 F.3d 345, 354 (7th Cir. 2005) (citation omitted) teaches:

> While credibility determinations are entitled to special deference because the ALJ is in a better position than the reviewing court to observe a witness, they are not immune from review.

That is particularly true for credibility determinations based on objective rather than subjective considerations (id.).

In rejecting Pryor's testimony, ALJ Boyle found dispositive (1) the absence of medical documentation of Pryor's complaints of back and neck pain, (2) the fact that Pryor did not seek treatment for over a year following her cervical discectomy and fusion and (3) Pryor's own statements at the Hearing that her

---

[12] Again it is not this Court's role to substitute its own judgment for Commissioner's.

pain was generally "tolerable." But unlike the analysis

completed in the preceding section of this opinion, here the

ALJ's rationale is unsupported by the record.

First, ALJ Boyle found that there was no medical evidence to

support Pryor's complaints of pain. As to her back problems the

ALJ found that her pain resolved after her 1997 lumbar epidural

injections and that "Dr. Gianioupoulos [sic] did not report any

low back problems" (R. 25). But those findings are directly

contradicted by the evidence. While Dr. Skaletsky's September

1997 letter stated that Pryor's injections had "markedly improved

her symptomatology," his followup note a year later described the

recurrence of Pryor's lower back pain (R. 196, 197).[13] Moreover,

Dr. Geannopoulos twice reported that Pryor complained of lower

back pain (id. 255, 257). While an ALJ is not required to

provide an express evaluation of every piece of evidence, he or

she must adequately consider the evidence that supports a

claimant's claim (see Godbey v, Apfel, 238 F.3d 803, 807-08 (7th

---

[13] Pryor has made two additional challenges to ALJ Boyle's
treatment of Dr. Skaletsky's notes. She argues that the ALJ
failed to provide a specific page reference for Dr. Skaletsky's
finding that the three lumbar epidural injections in 1997
relieved Pryor's lower back pain and that the ALJ "took for
granted" that physical therapy improved Pryor's symptoms.  On
that score Pryor is wrong:  ALJ Boyle's summary properly cited
the exhibit in which Dr. Skaletsky's 1997 letter appears--he was
not required to offer a particular page reference.  Moreover, the
ALJ's express conclusion that Pryor had cervical pain improved by
physical therapy was directly supported by Dr. Skaletsky's
treatment notes (see R. 194, 198).

18

Cir. 2000)). ALJ Boyle's wholesale disregard for the post-1997 evidence of Pryor's lower back pain falls far short of that mark.

ALJ Boyle fares no better as to his finding that there was no medical evidence to support Pryor's neck pain. In that respect ALJ Boyle stated that Pryor's fusion surgery in August 1999 relieved most of her neck pain (R. 25). Yet in his own summary of the record the ALJ discussed Dr. Chenelle's treatment note, which explained that Pryor's fusion surgery only temporarily relieved Pryor's symptoms and that she had returned to a neurologist for treatment a year later (id. 24). Indeed, Dr. Geannopoulos repeatedly related Pryor's complaints of neck pain (and related symptoms) in her June, July and September 2000 Reports (id. 234, 241, 255, 257).[14]

Second, ALJ Boyle discredited Pryor's pain testimony based on the fact that "[t]he record fails to show any ongoing

---

[14]   Pryor also challenges the ALJ's evaluation of the chiropractor's records as insufficiently thorough (P. Mem. 18), but in that regard the focus of her argument is misplaced. To the contrary, ALJ Boyle's analysis of the chiropractic records was indeed "thorough"--but it was incorrect. Pursuant to Reg. §404.1513(d) a chiropractor's records can be used only to demonstrate the severity of an impairment once that impairment is established. ALJ Boyle initially stated that the chiropractic records "do not indicate the severity of the pain that claimant alleges," but he ultimately found that they "support her allegations of some degree of pain" (R. 25). But having done so, the ALJ then dismissed that finding based on what he viewed as a "general lack of medical evidence" to support it. That, however, was improper--the same absence of support for his conclusion that there was a "general lack of medical evidence" supporting Pryor's claims of pain undercuts his attendant discounting of his findings based on Pryor's chiropractic visits.

19

treatment for neck problems for August 2000, more than a year after surgery" (R. 25). As already noted, Dr. Chenelle reported that Pryor had "immediate relief" after her surgery but that her symptoms returned a year later (id. 259). So it is entirely understandable and consistent with the medical evidence that Pryor would not seek treatment during the period singled out by the ALJ and yet that she was experiencing severe pain on the date of the Hearing.[15] Moreover, Pryor testified at the Hearing--and Dr. Geannopoulos' July 2000 Arthritic Report confirmed--that she was in physical therapy for her neck pain (id. 51-52, 241). If the ALJ needed documentation as to when that therapy began, he should have further inquired as much of Pryor (see SSR 96-7p, 1996 WL 374186, at *3; see also the four-Justice opinion in Sims v. Apfel, 530 U.S. 103, 110-11 (2000)).

Third, ALJ Boyle found that Pryor's testimony that her usual back and neck pain were "tolerable" discredited her other accounts of pain and attendant limitations. That approach is flawed when the statements are placed in proper context, as the

---

[15] Social Security Regulation ("SSR") 96-7p explains (1996 WL 374186, at *5):

Symptoms may vary in their intensity, persistence, and functional effects, or may worsen or improve with time, and this may explain why the individual does not always allege the same intensity, persistence, or functional effects of his or her symptoms. Therefore, the adjudicator will need to review the case record to determine whether there are any explanations for any variations in the individual's statements about symptoms and their effects.

ALJ failed to do. At least regarding her back pain, although Pryor described the pain as generally bearable, she testified that she was currently suffering from severe pain and seeking treatment as a result (R. 55).

More importantly, Pryor may have been able to tolerate her pain, but only at the limited level of activity in which she was engaged (cf. Clifford, 227 F.3d at 872): 45 minutes of walking a day (as prescribed by her physical therapist), limited household chores such as dusting and grocery shopping, going to church (at least "for the preaching part") and attending choir practice (R. 63, 65-67). ALJ Boyle's finding that Pryor could engage in "light work" would represent a significant increase in her daily physical activity: It would require her to lift up to 20 pounds, frequently lift up to 10 pounds and sit, stand and/or walk for up to six hours a day. That in turn undercuts the ALJ's reliance on her tolerance of pain in her nonworking environment--it will be remembered that Pryor testified that physical exertion and prolonged periods of standing and sitting exacerbate her pain, and that Dr. Geannopoulos' September Arthritic Report concurred that Pryor should not work in a position that requires extensive standing.

Because the primary difference between sedentary and light work is the amount of standing or walking required (see SSR 83-10, 1983 WL 31251, at *5), the ALJ's improper credibility

21

determination may have impacted his RFC analysis.[16]  Pryor's case
must therefore be remanded for a reevaluation of her complaints.

### Remaining Challenges to the ALJ's RFC Determination

Pryor's four remaining challenges to the ALJ's evaluation of
the evidence are really non-issues.  They can be disposed of
quickly.

First, Pryor asserts that ALJ Boyle analyzed Dr.
Geannopoulos' Cardiac Reports improperly--specifically, that the
ALJ failed to discuss the doctor's finding in one of the Reports
that Pryor has fatigue, palpitations and dyspnea upon ordinary
activity (P. Mem. 15-16).  But ALJ Boyle did note those
symptoms--he simply found more persuasive Dr. Geannopoulos'
finding that Pryor had no restrictions on performing activities
of daily living (R. 24).  Such weighing of the evidence is
entirely within the province of the ALJ and will not be disturbed
on appeal (see Haynes v. Barnhart, 416 F.3d 621, 626 (7th Cir.
2005)).

Second, Pryor claims that the ALJ failed to draw the
conclusion from the treatment notes of Drs. Roland and Chenelle
that Pryor's ailments were cyclical.  Neither of those doctors,
however, said just that.  Instead Dr. Roland noted only that

---

[16]    As n.8 reflects, because Pryor has no transferable
skills, she must be found disabled if she were to be found
capable of only sedentary work (see Reg. Pt. 404, App. 2, Table
No. 1).

22

Pryor had periods of one to three hours where she experienced no pain, while Dr. Chenelle simply remarked that Pryor's symptoms had returned following her August 1999 fusion surgery.

Third, Pryor contends that ALJ Boyle also failed to evaluate her obesity as required by SSR 02-1p. But Pryor never mentioned obesity as an impairment either in her application or at the Hearing. Even on the premise that the references to her weight in the medical records and the diagnoses of the state agency physicians sufficed to alert the ALJ that obesity could be a factor (Skarbek v. Barnhart, 390 F.3d 500, 504 (7th Cir. 2004) (per curiam)),[17] Pryor nowhere suggests that (let alone how) her obesity impaired her ability to work. Instead P. Mem. 20 just baldly asserts that the ALJ's failure to consider it "warrants reversal and remand." That statement does not however call for remand, particularly where the record makes clear that the ALJ relied on the opinions of the state doctors who diagnosed Pryor as obese in reaching his findings as to Pryor's impairments and limitations (Skarbek, 390 F.3d at 504).

Fourth and last, Pryor challenges the ALJ's reliance on the state agency physician's RFC assessment--but an ALJ is entitled to review and rely upon the opinion of a non-examining state

---

[17]    At 5 feet 5 inches tall and weighing 200 pounds, Pryor's Body Mass Index ("BMI") is 33.09. Under SSR 02-1p that BMI classifies Pryor as having Level I obesity (2000 WL 628049, at *2).

23

agency physician (see Rice, 384 F.3d at 370; Reg.
§404.1527(f)(2)(i)). Here ALJ Boyle's RFC decision was (as he
stated) not only consistent with the state physician's RFC
determination, which he found to be "well supported by the
record," but also largely conformed to the treating physicians'
recommendations.[18]

## Conclusion

Ultimately ALJ Boyle made one fatal error: His credibility
determination mischaracterized and overlooked probative evidence.
That error does not entitle Pryor to summary judgment, but rather
requires remand for a further and fuller consideration of Pryor's
complaints of pain. It may be that on remand the ALJ will reach
the same conclusion about Pryor's credibility, but that is for
the ALJ to decide (Clifford, 227 F.3d at 869).

It must be recognized that remand proceedings in a situation
such as this may pose an awkward problem. Unlike a Court of
Appeals' remand of an erroneous District Court judgment following
a trial, under which the Seventh Circuit's Rule 36 calls for
reassignment to a new District Judge, here a credibility
determination by a newly assigned ALJ could not include an

---

[18] Only one treating physician's report suggested that
Pryor was substantially more limited in her ability to work than
the ALJ's RFC decision suggested. Because that report almost
exclusively relayed Pryor's subjective complaints, if on remand
the ALJ once again finds Pryor not credible, the ALJ need not
give it weight (see Rice, 284 F.3d at 371).

effective evaluation of Pryor's testimony without the opportunity for an in-person observation that would have to be provided by a new hearing--an impermissibly wasteful requirement. That means that ALJ Boyle will have to make whatever extra effort is required to avoid having his prior determination drive the outcome on remand. And nothing in his handling of the case to this point suggests that he should have any difficulty in doing so.

That said, it does not appear that the alternative request advanced by Pryor's counsel (P. Mem. 23) "for a new hearing and an opportunity to present additional evidence" is in order. If on remand the ALJ can adhere reasonably to his adverse view of Pryor's credibility, his finding of no disability will stand. If on the other hand he changes his view in light of this opinion, the linkage between (1) Pryor's credible complaints and (2) the medical evidence discussed here under Credibility Determination may well result in a finding of disability. Which of those results will obtain remains to be seen.

In any event, the possibility that the ALJ may not alter his earlier conclusion is implicit in the posture of this case, and it cannot alter this Court's resolution. Both Rule 56 motions are denied, and the case is remanded to Commissioner for further

proceedings in accordance with this opinion.[19]

_____

Milton I. Shadur
Senior United States District Judge

Date:   February 23, 2006

---

[19]   Because no additional evidence is called for on remand,
this decision is a "sentence four" remand under Section 405(g).